.FILED

AUG 0 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

07-187

Factual Proffer of Derek T. Hawthorne

  The facts contained herein are not complete in all details. Instead, these facts are the minimum necessary to provide the factual predicate for the guilty plea. Derek T. Hawthorne has provided additional facts to the United States which are not contained herein about this conspiracy. These are not all of the facts known to the defendant, Derek T. Hawthorne (hereinafter "Hawthorne"), and to the Government. Wherever in this proffer the words "drug proceeds" are used, this means property or money constituting, or derived from, proceeds that Hawthorne obtained directly or indirectly from his conspiracy to distribute methamphetamine, and sometimes MDMA.

  Beginning in at least 2004 until his arrest on July 6, 2007, Hawthorne possessed with intent to distribute and distributed methamphetamine (hereinafter also "meth") in Virginia and the District of Columbia. Hawthorne conspired with others, including Henry David Corona ("Corona"), Daniel Alford ("Alford"), Danielle Kharman ("Kharman"), Joseph Federici ("Federici"), and Matthew Trone ("Trone"), among others, to possess meth for purposes of distribution.

  Hawthorne worked as a flight attendant for United Airlines between 1998 and 2007. In his capacity as a flight attendant, he often flew to Europe. Beginning in approximately 2002, Hawthorne made contact with persons in Europe who had access to MDMA, also known as Ecstasy or E-pills. He purchased E-pills initially beginning in at least 2002, smuggling them through airport security from Europe to the United States. He would later distribute the pills in Virginia and Washington, D.C. Through his connections in the E-pill trade, Hawthorne learned that meth, specifically crystal methamphetamine, was a drug that was growing in popularity and he saw an opportunity to profit from the distribution of meth.

  In at least 2004, but possibly earlier, Hawthorne developed sources of supply in California and Washington State for crystal meth. Thereafter he began purchasing pound quantities of meth and transporting them back across the country via commercial aircraft. Some of the meth Hawthorne purchased came from Paris Payton, Hector (last name unknown), and Erik Arenas, a.k.a. "Flaco," though he also had other suppliers.

  Hawthorne distributed the meth to other mid-level suppliers in the Washington metropolitan area, selling amounts ranging from an "eight-ball" or a "game" (approximately 3.5 grams) to multi-ounce quantities. Hawthorne knew and understood that these amounts were frequently resold by his customers. Hawthorne encouraged his meth customers to pay in large bills or to use money orders to pay for their meth, even directing customers to a nearby 7-11 store where such money orders could be purchased.

  In March 2006, Hawthorne opened an account at Citigroup Smith Barney with the assistance of Joseph Federici, a financial advisor at Citigroup Smith Barney who was a meth customer of Hawthorne. Federici knew that Hawthorne was a seller of meth. In fact, Federici bought meth from Hawthorne aboard Hawthorne's yacht (the "Oar-Gazmic") and from within Hawthorne's apartment when he lived in the Post Mass building in the District of Columbia. Also, Federici used meth in

13

front of Hawthorne aboard the yacht and in other locations as well. After opening the account for Hawthorne, Federici contacted Hawthorne about investing together in a pound of meth.

In December 2006, Hawthorne purchased the residence at 943 S Street, N.W., Washington, D.C. for $925,000. Using mortgage broker Matthew Trone, Hawthorne secured a "no document" loan. In the application for that loan, Hawthorne falsely claimed that he was the self-employed co-owner of a printing company earning a salary over $14,000 per month; in fact, Hawthorne was not so employed. Hawthorne made a down payment of $205,000 which he obtained from his Commerce Bank and Bank of America accounts. The money from Commerce Bank and Bank of America was comprised overwhelmingly of cash deposits and money order deposits that Hawthorne had structured to be less than the $10,000 amount which would trigger the mandatory filing of a currency transaction report. All of this down payment came from drug proceeds. Despite claiming that he had legitimate employment to support such a mortgage, Hawthorne did not file income taxes at all between 2004 and 2007. After purchasing the house, Hawthorne began substantial renovations for which he paid contractors and vendors with drug proceeds.

At the time Hawthorne purchased 943 S Street, N.W., Trone was a meth customer of Hawthorne and Trone had used meth aboard Hawthorne's yacht and in Hawthorne's presence. Trone knew that Hawthorne sold meth in order to make a living and Trone would sometimes purchase meth from Hawthorne. Further, in June and July of 2007, when Hawthorne complained to Trone that he no longer had a ~~needed a better~~ customer base for his meth, Trone offered to help Hawthorne get some sales ~~develop a customer base~~ while they were on a summer trip to Provincetown, Massachusetts. In June 2007, while Hawthorne was meeting with Eric Arenas in Long Beach, California to purchase two pounds of meth, Hawthorne used text messaging to advise Trone of his progress in acquiring the meth. When he returned from California with the two pounds of meth, Hawthorne gave a small portion of it to Trone and also took some of the meth to Provincetown to try to sell it.

Between 2004 and 2007 Hawthorne's legitimate income was largely inconsequential and did not remotely support the deposits he made or the items he purchased. In 2004, Hawthorne's legitimate income was $3,683.73. In 2005, Hawthorne earned only $15,366.09. In 2006, Hawthorne earned $614.04 from United Airlines and $1,344.00 from Social Security for a total of $1,958.04. In the first six months of 2007 Hawthorne earned only $105.43 from United Airlines and $690.00 from Social Security for a total of $795.43.

Between March 2006 and March 2007, Hawthorne sold crystal meth to Henry David Corona (a.k.a. "Norr") on at least six occasions in controlled buys that were monitored and recorded by the Drug Enforcement Administration ("DEA"). Hawthorne sold some of the meth to Norr on the motor yacht "Oar-Gazmic" during 2006. He also sold some of the drugs to Norr from his house at 943 S Street, N.W.

In June 2007, Hawthorne sold a half an ounce of meth to Daniel Alford, a wholesale meth customer, from his home on 943 S Street, N.W. In June 2007, Hawthorne also sold a half an ounce of meth to Danielle Kharman from 943 S Street, N.W. Hawthorne knew that both Alford and

14

Kharman would re~~sell~~ *distribute* the meth to ~~their customers~~ *others*. Hawthorne also sold to several other customers from the home at 943 S Street, N.W. After Hawthorne learned of Kharman's arrest, he removed 800 grams of meth from his home and took it to a storage space he rented at 26 K Street, S.E., Washington, D.C. Hawthorne secreted the meth there, although it was later seized by the DEA. In the same storage space, Hawthorne kept a digital scale for purposes of weighing meth for resale.

Beginning in 2004, Hawthorne began to receive large profits from his drug selling which he deposited into various financial institutions in the form of cash deposits and money order deposits, all of which were drug proceeds.

Hawthorne opened two accounts at Bank of America into which he deposited substantial drug proceeds. On March 9, 2005, Hawthorne opened account 0041-1207-4991. Between March 2005 and June 2007, Hawthorne deposited $282,000 in cash and $150,039.01 in money orders into that account. In 2002, Hawthorne opened account number 0041-1389-3472. Between January 2004 and June 2007, Hawthorne deposited $330,635 in cash and $111,095 in money orders into that account. All of these deposits were drug proceeds.

Hawthorne opened two related accounts at Alliant Credit Union into which he deposited substantial drug proceeds. Between September 2004 and May 2005, Hawthorne deposited $32,400 cash and $6,000 in money orders into checking account number 0018918701-40. Between September 2004 and May 2005, Hawthorne deposited $24,900 cash and $6,000 in money orders into account number 0018918701-01. All of these deposits were drug proceeds. Further, Hawthorne also deposited $180,000 in wire transfers from the Bank of America accounts which amount was also drug proceeds.

Hawthorne also deposited substantial drug proceeds into accounts he opened at Commerce Bank. In February 2006, Hawthorne opened account number 3990013777. Between February 2006 and June 2007, Hawthorne deposited $49,128.43 in cash and $39,650 in money orders, all of which were drug proceeds. In February 2006, Hawthorne also opened account number 4990009385. Between February 2006 and April 2006, Hawthorne deposited $7,028.42 in cash and $16,950 in money orders all of which were drug proceeds. In March 2006, Hawthorne opened account number 4990008593. Between April 2006 and June 2007, Hawthorne deposited $22,350 cash and $7,225 in money orders all of which were drug proceeds.

Using money he had previously deposited into the above-listed accounts, in 2006 Hawthorne opened an account at Citigroup Smith Barney with the assistance of Joseph Federici, a financial advisor and meth customer of Hawthorne. In ~~March 2007~~ *2006*, Hawthorne deposited over $300,000 into that account. By June 2007, that account contained $375,608.25 in drug proceeds. Between March 2006 and December 2006 Federici electronically transferred funds totaling $6,800 to Hawthorne to purchase meth.

Between 2004 and July 2007, Hawthorne deposited more than 690 money orders totaling more than $336,329.01 into the above-listed accounts. All of these money orders were personally signed

15

by Hawthorne and all were the proceeds of illicit drug sales. Between 2004 and July 2007, Hawthorne personally deposited over $748,441.85 in cash, most of which he structured into deposits of less than $10,000 to avoid the filing of a currency transaction report. Since that time, Hawthorne has made additional deposits of cash and money orders which are drug proceeds.

In 2006, Hawthorne purchased the motor yacht he later renamed the "Oar-Gazmic" (hull number SERF8267G001) for $205,000. In order to pay for this boat, on March 24, 2006, Hawthorne obtained a check in the amount of $105,000 from Citigroup Smith Barney located in McLean, Virginia. Funds for the check were withdrawn from a line of credit obtained by Hawthorne. On the same day Hawthorne also obtained a cashier's check for $95,000 from the Bank of America branch located at 1090 Vermont Avenue in Northwest Washington, D.C. The funds for this check were withdrawn from Hawthorne's account, number 0041-1207-4991, which was comprised of drug proceeds. Hawthorne paid the remaining $5,000 in cash which was also drug proceeds. Therefore, this yacht was purchased entirely with drug proceeds. Further, after acquiring the yacht, Hawthorne sold meth from the yacht to his customers.

In December 2006, Hawthorne purchased the home located at 943 S Street, N.W., Washington, D.C. for $925,000. Hawthorne placed approximately $205,000 down on the property, $130,000 of which came from his accounts at Commerce Bank and which was comprised entirely from drug proceeds. Hawthorne obtained a mortgage for the balance. Approximately $75,000 of the down payment came from Hawthorne's Bank of America accounts and was comprised entirely from drug proceeds. After purchasing the home Hawthorne sold meth from that location on many occasions.

Using drug proceeds Hawthorne also bought two Yamaha personal water craft, a Rinker power boat, and a Cadillac Escalade automobile. He also used drug proceeds in opening an ING Direct account. In July 2006, Hawthorne paid management at the Post Mass apartment building over $17,000 in cash to avoid eviction from the Post Mass.

Accordingly, the total amount of methamphetamine that the defendant possessed for the purpose of resale was more than 1.5 kilograms of methamphetamine (actual) and/or "Ice." That amount represents not just the amount that the defendant received for himself, but also that quantity that was reasonably foreseeable to him based on his involvement in the narcotics conspiracy.

      I agree that the above facts are true and correct. The above facts are not all that are known to Derek T. Hawthorne, but facts sufficient to establish the offenses to which he is pleading guilty.

_____
Derek T. Hawthorne, Defendant

_____
James Rudasill, Jr., Esq.
Counsel for Mr. Hawthorne

_____
S. Elisa Poteat
Gregory G. Marshall
Assistant U.S. Attorneys

17