UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 07-187 (TFH) |
| | : | |
| v. | : | (Under Seal) |
| | : | |
| DEREK T. HAWTHORNE, | : | |
| Defendant. | : | |

**GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE FROM GUIDELINES
AND STATUTE AND MEMORANDUM IN AID OF SENTENCING**

The United States of America, by its attorney, Jeffrey A. Taylor, the United States Attorney for the District of Columbia, respectfully requests that the defendant be sentenced to a term lower than is advised by the United States Sentencing Guidelines, and to a term lower than the mandatory minimum sentence called for by 21 U.S.C. § 841.  Further, the United States notes facts relevant to sentencing the defendant.

**I. Background of the Case**

On August 3, 2007, defendant Derek T. Hawthorne (hereinafter "Hawthorne") pleaded guilty, pursuant to a cooperation plea agreement, to a charge of Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or More of Methamphetamine, in violation of 21 U.S.C. § 846 and 841(a)(1) and (b)(1)(A)(viii), and Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. § 1957.  Presentence Disclosure Report ("PSR") ¶ 1.  The defendant acknowledged, pursuant to U.S.S.G. § 1B1.3, that he was accountable for more than 1.5 kilograms of methamphetamine (actual) and/or "ice."  Id. ¶ 25.

## II. Defendant's History and Criminality

Hawthorne first came to the attention of the Drug Enforcement Administration (hereinafter "DEA") in December 2004. During an earlier related investigation, Hawthorne was identified as a seller of MDMA, or ecstasy pills. Plea Agreement, p. 13, ¶ 3. Individuals who identified him at that time noted that, unlike his customers, Hawthorne did not use drugs. Instead Hawthorne frequented homes where drugs were traded and used, including a home in Alexandria where he lived for a while, and James Homanich's home in Washington, D.C., which was eventually seized by the DEA as a "facilitating property."

In the fall of 2004, however, Hawthorne began to supply methamphetamine to his contacts. Unlike most sellers of methamphetamine in this area, Hawthorne was repeatedly identified as one of the few methamphetamine sellers who did not also use the drug. Consumers of methamphetamine who began buying from Hawthorne during that time period noted that Hawthorne's methamphetamine was more potent and cheaper than what they had been receiving in the past.

After renting a room in a group home in Alexandria, Hawthorne was able to move to the Post-Mass Apartments, with Randy Estes, a meth user and seller. Id. at p. 16, ¶ 3. According to tax and wage records received by the government, Hawthorne had very little income between 2004 and 2007. Id., p. 14, ¶ 1 and ¶ 3. During this period of time, he sold drugs to support and enrich himself, making a very large profit. Indeed, between 2004 and his arrest in 2007, Hawthorne deposited more than one million dollars of drug proceeds into his various accounts. Id. at p.6, ¶ 18-19. He purchased boats, including a yacht valued at over $250,000, jet skis, a smaller pleasure boat, and a home that cost over $900,000. Id. Hawthorne opened a diverse investment account with the help of Joseph Frank Federici, his occasional methamphetamine customer and financial planner.

At the same time, many of Hawthorne's drug-addled customers slipped further into addiction, homelessness and despair. As a sober person, Hawthorne must have realized the terrible impact he was having on this subculture.

Eventually, after a lengthy and focused investigation that involved many controlled purchases of methamphetamine through intermediaries, nationwide surveillance, over 35 grand jury subpoenas, and wiretaps on several of Hawthorne's communications, Hawthorne was finally apprehended by the DEA. When arrested, Hawthorne had just traveled to Los Angeles to meet a methamphetamine source. Wiretaps were running at that time. Hawthorne returned to Washington and placed the majority of his methamphetamine purchase in a storage locker which the DEA searched pursuant to a clandestine, court-authorized warrant. Hawthorne kept a safe in the storage space and a digital scale. Some of Hawthorne's customers were arrested as they left the area of his home with methamphetamine purchases in their hands. After one customer was arrested and her boyfriend called Hawthorne, a tracking device on Hawthorne's car revealed that he went to the storage space. The next day, the drugs were recovered there where Hawthorne has clearly put them in an effort to avoid detection and save his product from seizure..

### III. Cooperation

Hawthorne provided information to the government about several targets and defendants in debriefings, and he did so immediately after his arrest. However, because of his prior career as a flight attendant, his international mobility, and the seriousness of the offense, the government elected not to use him pro-actively. Hawthorne provided agents in California with information about one of his sources of supply, Eric Arenas, a.k.a. "Flaco." Arenas had a pending case in Los Angeles County Superior Court when he and Hawthorne were transacting business in July 2007. However,

Arenas had been released on bond, and was selling methamphetamine while at liberty. With Hawthorne's information, agents were able to arrest Arenas on new charges. When Arenas knew that Hawthorne would testify against him, he entered a guilty plea to significantly higher charges than he had originally been facing.

Hawthorne also provided information about Joseph Frank Federici. Federici, a financial planner at Citi-Smith Barney who suffered from an addiction to methamphetamine, eventually pleaded guilty to conspiracy and money laundering charges in the Eastern District of Virginia. Federici's plea was entered only after he realized that Hawthorne could testify against him.

Hawthorne provided extensive information about other suppliers and customers. The government will advise the court about this information at the time of sentencing and will not further elaborate herein since many of these individuals are under investigation.

### IV. Sentencing

The government moves this Court, pursuant to 18 U.S.C. § 3553, not to apply the mandatory-minimum sentence of ten years, and to depart downward from the United States Sentencing Guidelines pursuant to U.S.S.G. §5K1.1, as Hawthorne has provided substantial assistance. We request that Hawthorne be sentenced to a period of incarceration of eight years and a full term of supervised release.

While Hawthorne certainly provided substantial assistance, his crimes still merit significant punishment. Hawthorne literally grew wealthy through methamphetamine sales and the exploitation of addicts. He further acted as a leader in the conspiracy. Hawthorne's criminal network included more than five members and was otherwise extensive. As a methamphetamine conspiracy it did not follow the same paradigm as normal street-level drug conspiracies since methamphetamine is often

traded via the internet, through clubs, or shared in sexual situations in hotel rooms. Hawthorne's criminal associates included personal contacts whom he used intermediaries in order to insulate himself from detection. At various times he was assisted by Henry David Corona, who told others he was working as Hawthorne's personal assistant, and Randy Estes, who resided at the Post-Mass in the same apartment as Hawthorne, and who sold methamphetamine he received from Hawthorne directly from that apartment. Hawthorne's criminal organization included Danielle Kharmen, Daniel Alford, Matthew Trone, Paris Peyton, Eric Arenas, "Hector" last name unknown, Joseph Frank Federici, Henry Ferguson, and others. Hawthorne directed aspects of his co-conspirators' criminal activity. For example, he told purchasers to use large bills and money orders when they paid him for drugs.[1] These cash payments and money orders constituted most of his million dollar-plus deposits. Hawthorne structured his finances to avoid detection and maximize his wealth by using the professional resources of co-conspirators, such as Matthew Trone, a mortgage broker who assisted him with the purchase of his home using a "stated" loan, and Joseph Frank Federici, his financial planner and occasional methamphetamine customer.[2] Hawthorne also shifted money between several accounts during the height of the conspiracy, seeming to keep the balance in each account at a level that would allow him to be compensated under the FDIC.[3] Hawthorne claimed

---

[1] See p. 13 of Plea Agreement, factual proffer, ¶ 5.

[2] Hawthorne falsely claimed to be proprietor of a printing business in his loan application. This application was used to secure a mortgage on his home with the assistance of co-conspirator Matthew Trone, a mortgage broker. Plea Agreement, p. 14, ¶¶ 1-4.

[3] The plea agreement memorializes Hawthorne's finances most exactly in the asset forfeiture paragraphs which read as follows:
  6. To carry out in part his agreement for this forfeiture, your client agrees

a far larger amount of the drug proceeds than his underlings.  Hawthorne knew that his customers

---

> to forfeit to the United States a total of $1,110,570.86.  Your client agrees that this amount is property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of the conspiracy to which your client is pleading guilty under the terms of this agreement.  Your client agrees to the entry of a Consent Order of Forfeiture in the form of a money judgment in the amount of $1,110,570.86, as well as for the forfeiture of any property, including a yacht and the funds on deposit in eight accounts, which funds were seized by the government, if the government chooses to proceed with forfeiture of that property in this manner.  Your client agrees the Court should enter at the time of his guilty plea (or before sentencing) a preliminary order of forfeiture of such property.
> 
> 7.    In addition to the entry of this money judgment, and as a further part of this agreement, your client also agrees to the forfeiture of the following assets:
> 
> (a)    All his interest, right, or title in the real property and improvements at the address of 943 S Street, N.W., Washington, D.C. (including any improvements made to that property since the date of purchase, even if those improvements are able to be removed).
> 
> (b)    All funds on deposit in the following accounts at the time the seizure warrants were executed on these accounts on or after July 10, 2007:
> 
> Citi SmithBarney, account number 56J-70896-10;
> Bank of America, N.A., account number 004112074991;
> Bank of America, N.A., account number 0041-1389-3472;
> Alliant Credit Union, account number 0018918701-40;
> Alliant Credit Union, account number 0018918701-01;
> Commerce Bank, N.A., account number 3990013777;
> Commerce Bank, N.A., account number 4990009385;
> Commerce Bank, N.A., account number 4990008593; and
> 
> (c)    All interest, right, and title in
> i.    A 2001 Sea Ray 41.3 yacht, bearing hull identification number SERF8267G001, official number 1102931, and vessel's name is OAR-GAZMIK;
> ii.   A 2005 Rinker 250 Fiesta Vee Express Cruiser, serial No. 16814F405 vessel identification number RNK76814F405
> iii.  A Load-Rite trailer, serial number 5A4BCWW2842000589;
> iii.  A 2005 Yamaha personal water craft (jetski) identification number YAMA2831K405;
> iv.   A 2005 Yamaha personal water craft (jetski), identification number YAMA3699K405;
> v.    a 1998 Cadillac Escalade automobile, vehicle identification number 1GYEK63N42R108902.  Plea Agreement, pp. 3-4

were reselling, or more precisely redistributing the drug. He lived in the same apartment as Randy Estes, whom witnesses observed selling methamphetamine inside the apartment. While in Los Angeles to buy methamphetamine in July 2007, Hawthorne corresponded by text messaging with Daniel Alford. Alford clearly referenced the fact that he had methamphetamine customers in these texts, including one text wherein Alford stated euphemistically that his customers were growing restless. Moreover, Hawthorne's oral communications with Matthew Trone during the wiretap reveal that Trone was assisting him in locating methamphetamine customers, and Trone asked Hawthorne to let him to sell methamphetamine to others while the two were vacationing in Provincetown, Massachusetts during the 4th of July, 2007. Further, Hawthorne knew that several of his customers, including Henry David Corona were reselling the drugs, particularly since the amounts purchased at times were consistent with resale and since he personally observed one sale by Corona while the two were hosting guests on Hawthorne's boat. Also, several years earlier, Corona brought in a customer, Van Etheridge, to clean a pound of bad methamphetamine so he could resell it. In exchange for this assistance, Hawthorne gave Etheridge an 8-ball, or 3.5 grams of methamphetamine. <u>United States v. Bartley</u>, 230 F.3d 667, 673-4 (D.W.VA, 2000) (supervisory enhancement supported by fact that defendant set price and terms of payment, handled proceeds, arranged logistic, directed others to wire proceeds); <u>United States v. Barnes</u>, 993 F.2d 680, 685 (9th Cir. 1993) (supervisory enhancement supported where defendant negotiated price of drugs, used a person to deliver money, counted the money, set the price of the drugs and handled delivery logistics); accord <u>United States v. Otero</u>, 890 F.2d 366, 367 (11th Cir. 1989), <u>United States v. Farrell</u>, 893 F.2d 690, 693 (5th Cir. 1990), <u>United States v. Monroe</u>, 943 F.2d 1007, 1019 (9th Cir. 1991)(supervisory enhancement proper where defendant exercised decision making authority

logistics of sale). In debriefings, Hawthorne admitted these events, and the government has also independently corroborated this information with other cooperators. Further his text messages reveal that he set the price, chose the location for meetings, and knew his customers distributed their drugs after they received them.

Due to the blurring of social and drug-selling contacts, many of Hawthorne's social contacts were also co-conspirators. In recalling these relationships during debriefings Hawthorne was very forgiving of himself and tended to downplay the extent to which his associates were influenced by their addiction, and the extent to which he gained social acceptance and contacts with other men due to his appearance of wealth and access to methamphetamine. Hawthorne commanded the price for his drugs, and dictated the terms and location of their sale, as evidenced by a text wherein he dictates a price change. Hawthorne recruited assistance from Trone and Federici to launder his drug proceeds, and knew that many of his customers were reselling the drugs he sold them. For all these reasons, Hawthorne was a leader of the conspiracy.[4] There can be no doubt that Hawthorne does not, and did not, see himself in this way. However, the disparate power between Hawthorne and Henry David Corona, as only one example, makes clear this leadership role in keeping with U.S.S.G. § 3B1.1(a).

The government also recognizes that Hawthorne believes that he entered the illicit drug

---

[4]

The Plea Agreement contains the following language on p. 4 in ¶12:
> The Government agrees that it will not seek any increases in your client's base offense level other than those which are agreed to by your client in this paragraph. The government will seek to increase your client's base offense level by four points pursuant to Federal Sentencing Guideline 3B1.1 (a) in that he was an organizer and leader of criminal activity that involved five or more participants and was otherwise extensive.

business in large part to provide for himself and his daughter after he was diagnosed with a serious illness. However, Hawthorne's accumulation of wealth through methamphetamine sales was never justified. Further, his purchase of diminishing-value assets, such as a yacht, jet skis, and a second pleasure boat, tends to demonstrate that his motives were far more complex.

Without the government's motion, Hawthorne would face a very lengthy sentence of much more than eight years. The government therefore believes that, in balance, the interests of justice are best served by Hawthorne receiving a sentence of eight years.

WHEREFORE, the government requests that the defendant be sentenced accordingly.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar No. 498-610

_____
S. Elisa Poteat
Assistant United States Attorney
D.C. Bar. No. 420-604
Organized Crime and Narcotics Trafficking Section
555 Fourth Street, N.W., Room 4820
Washington, D.C. 20530
(202) 514-7067
E-mail: Elisabeth.S.Poteat@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

    I HEREBY CERTIFY that service of the foregoing pleading was made by electronic mail upon counsel for the defendant, Nikke Lotze, Esq., at nlotze@robertsandwood.com, this 28th day of August, 2008.

                                                                        _____
                                                                        S. Elisa Poteat
                                                                        Assistant United States Attorney

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 07-187 (TFH) |
| | : | |
| v. | : | (Under Seal) |
| | : | |
| DEREK T. HAWTHORNE, | : | |
| Defendant. | : | |

**ORDER**

Having reviewed the Government's Motion for a Downward Departure and Memorandum in Aid of Sentencing, the Government's Motion is hereby GRANTED.

It is hereby ORDERED that the defendant shall be sentenced to a period of _____ months of incarceration, to be followed by a period of _____ months of supervised release, with the following conditions:

So ORDERED, this the ____ day of _____, 2008.

_____
THOMAS F. HOGAN, JUDGE
UNITED STATES DISTRICT COURT FOR THE
 DISTRICT OF COLUMBIA